IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. CROIX

BRUCE MARTIN                    :        CIVIL ACTION
                                  :
     v.                        :
                                  :
POWERMATIC, INC., et al.      :        NO. 01-0137

MEMORANDUM

Bartle, C.J.                                                    June 4, 2008

        Plaintiff, Bruce Martin, has sued defendants, Powermatic, Inc. and Jet Equipment and Tools, Inc. ("JET"). He seeks damages for an injury he suffered while using a saw at his place of employment, Armery Industries, Inc. ("Armery"). Before the court is the motion of defendant JET for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

I.

        The following facts are either undisputed or viewed in the light most favorable to plaintiff, the non-movant. Plaintiff, Bruce Martin, was employed as a cabinet maker with Armery. On June 19, 2000 Martin was injured at work while operating a saw. Martin was cutting pieces of "ply board" when a piece that he was holding in his left hand hit the saw's blade and pulled his hand into it. Martin lost three fingers on his left hand as a result of the injury.

        Plaintiff claims that the saw that caused his injury is a "Powermatic Model 68 12" Tilting Arbor Saw." When the accident

occurred the saw contained no markings.  At some point after the accident an unknown person wrote "Model No. 68" on the saw.  JET disputes that the saw in issue was a "Powermatic Model 68 12" Tilting Arbor Saw" or even a Powermatic product.  Nevertheless, JET maintains that even if plaintiff is correct, it is still entitled to summary judgment.

While the exact date of manufacture of the saw is unknown, the record reflects that it was made in the 1950s or 1960s.[1]  The saw was purchased by its original owner, Bob Johnson, for use in Africa.  At some point it was taken to the Virgin Islands and was purchased by Armery by 1960.  John Bishop acquired Armery in 1985 and received no information about the maintenance, repair or service history of the saw at that time.  When Bishop became the owner of Armery, the blade guard which had originally been attached to the saw had been removed or otherwise lost.

The corporate history of the named defendants is complex.[2]  Powermatic, Inc. was incorporated in 1963.  It was purchased by Houdaille Industries, Inc. in 1966 and became known

---

1. Plaintiff asserts in its statement of facts that the saw was manufactured in the 1970s.  We believe this is a typographical error as the record is clear in numerous places that Armery obtained the saw in the 1960s.

2. Only JET outlined the corporate history of the named defendants between 1966 and 1999.  Plaintiff has not contested those facts.  While the exact legal structure of the transactions during that time is not abundantly clear from the record, it is only the nature of the transaction between DeVlieg-Bullard, Inc. and JET that is pertinent to the motion before us.

as Powermatic-Houdaille, Inc.[3]  In January, 1986, Houdaille Industries, Inc. sold three of its subsidiaries, including Powermatic-Houdaille, Inc., to C.E. Bradley Acquisition Corp., a/k/a Stanwich Partners.  At some point between 1986 and 1989, Powermatic-Houdaille, Inc. was sold or otherwise transferred to DeVlieg-Bullard, Inc. which then created the Powermatic Division of DeVlieg-Bullard, Inc.

On July 15, 1999, DeVlieg-Bullard filed for Chapter 11 bankruptcy in the Bankruptcy Court of the Northern District of Ohio.  Thereafter, the Bankruptcy Court established an offer procedure to auction the assets of the Powermatic Division of DeVlieg-Bullard, Inc.  An auction was held on September 27, 1999.  The Bankruptcy Court entered an Order on September 29, 1999 authorizing the sale of the Powermatic Division assets to JET.  The Order states:

> After the Closing, neither [JET] nor any of its affiliates shall be deemed to be a successor of [DeVlieg-Bullard] and [JET] and its affiliates shall not be responsible for any of [DeVlieg-Bullard's] liabilities or obligations, other than those expressly assumed by [JET] pursuant to the Asset Purchase Agreement and the Amendment.

Def.'s Statement of Undisputed Facts, Ex. I at ¶ J.

The Asset Purchase Agreement that is referenced in the Bankruptcy Court's Order states:

---

3.  It is unclear from the record what exactly happened to the company "Powermatic, Inc." after it was acquired by Houdaille Industries, Inc.

> Subject to the conditions specified in this Agreement, Buyer hereby agrees to assume at the Closing and discharge when due and payable the following liabilities of Seller related to the Business ...
> (c) <u>Warranty Claims</u>.  All liabilities for warranty claims with respect to products of the Business, regardless of whether such claim occurred before, on or after the Closing Date;
> (d) <u>Product Liability Claims</u>.  All liabilities for product liability claims with respect to products of the Business sold on or after the Closing Date ....

Def.'s Statement of Undisputed Facts, Ex. J at § 1.4.

On October 5, 1999, JET formed Powermatic Corporation and thereafter transferred its right to purchase the Powermatic Division assets to Powermatic Corporation.  The Closing Date of the sale was October 15, 1999.  On June 30, 2001 Powermatic Corporation and JET merged, leaving JET as the surviving corporation.  Sometime in January, 2002, after plaintiff filed his amended complaint, "a purchase [was] made with Wilton Corporation" and JET was renamed WMH Tool Group.  Def.'s Statement of Undisputed Facts, Ex. P at 14.  The exact nature of the transaction with Wilton Corporation is unclear.

## II.

Plaintiff filed an amended complaint on August 14, 2001. Count I alleges that at the time Powermatic, Inc. sold the saw it was "defective and unreasonably dangerous for its intended use." Am. Compl. at 2.  Count II claims that Powermatic, Inc. and JET were negligent in their failure to: (1) "properly and adequately test and inspect the machine;" (2) "design, fabricate,

manufacture, sell, label, distribute and/or supply and/or safely develop and test the machine in order to insure or safeguard against the inherent dangers of the machine or to provide a safe machine;" and (3) "keep abreast of the state of the art, science, engineering, safety design and construction design of the machine and its safety features ...." Id. at 3. Count III alleges that Powermatic, Inc. and JET breached their warranties that "the machine was of good quality and ready for use at Armory [sic] Industries, Inc., that it was fit for use in the carpentry business; that the various components of the product were manufactured of good merchantable parts; that it was properly designed, retooled, refurbished, assembled, inspected and tested."[4] Id. at 4.

JET, in an earlier summary judgment motion, argued that it "purchased the Powermatic Assets 'free and clear,'" pursuant to the Bankruptcy Court's September 29, 1999 Order and thus it "cannot be liable for Plaintiff's injuries." Martin v. Powermatic, Civ. A. No. 01-137 (D.V.I. Nov. 22, 2006). Our predecessor in this case, Judge Raymond L. Finch, concluded that "[t]he Bankruptcy Court did not order that the sale be free and clear of all liabilities, in that certain liabilities were expressly retained, and did not expressly make the sale free and clear of all claims arising after the sale." Id. at 4. Judge

---

4. The amended complaint includes a fourth count in which plaintiff seeks compensatory, special and consequential, and punitive damages.

Finch further stated that "the Court does not address, at this juncture, whether there is a factual basis to hold Defendants liable under a successor liability theory because, although the parties touched on that issue, it was not sufficiently briefed." Id. at 6.  The parties have now sufficiently briefed the issue of successor liability which forms the basis of JET's current motion for summary judgment.[5]

### III.

Plaintiff's amended complaint asserts two counts sounding in tort.  Count I of plaintiff's amended complaint states a strict liability claim.  Where, as here, there is no governing statute, the law of the Virgin Islands provides that "[t]he rules of the common law, as expressed in the restatements of the law approved, by the American Law Institute ... shall be the rules of decision in the courts of the Virgin Islands ...." 1 V.I.C. § 4.  The Restatement 2d of Torts provides:

> (1) One who sells any product in a defective
> condition unreasonably dangerous to the user
> or consumer or to his property is subject to
> liability for physical harm thereby caused to
> the ultimate user or consumer, or to his
> property, if
> (a) the seller is engaged in the business of
> selling such a product, and

---

5. Attached to plaintiff's opposition to the motion of defendant for summary judgment is "plaintiff's objection to defendant's filing of a renewed motion for summary judgment."  In his objection, plaintiff maintains that JET is merely rehashing arguments that were previously made and ultimately rejected by Judge Finch.  We disagree.  Judge Finch explicitly stated that he could not consider whether JET is subject to successor liability because the issue had not been briefed.  We now have occasion to consider that issue.

>    (b) it is expected to and does reach the user
>    or consumer without substantial change in the
>    condition in which it is sold.
>
>    (2) The rule stated in Subsection (1) applies
>    although
>    (a) the seller has exercised all possible
>    care in the preparation and sale of his
>    product, and
>    (b) the user or consumer has not bought the
>    product from or entered into any contractual
>    relation with the seller.

Restatement 2d Torts § 402A.

Section 402A thus imposes strict liability upon the seller of a product that is "in a defective condition unreasonably dangerous to the user ...." Id. To withstand a motion for summary judgment a plaintiff must demonstrate that a genuine issue of material fact exists regarding whether the seller's "product was manufactured in a defective condition ... such that it was unreasonably dangerous to the user and ... it ... was the factual and proximate (legal) cause of injury ... without having been substantially changed from the condition in which it was sold." Clecher v. Spider Staging Corp., 892 F. Supp. 710, 714 (D.V.I. 1995).

Count II of plaintiff's amended complaint asserts a claim based on negligence. To withstand a motion for summary judgment on a claim of negligence, the plaintiff must demonstrate that "a genuine issue of fact exists with respect to: (1) a duty of care owed to [plaintiff], (2) a breach of that duty by [defendant], which (3) was the factual and proximate (legal) cause of (4) damages to [plaintiff]." Id.

-7-

Under both Counts I and II of plaintiff's amended complaint, JET may be liable only under limited circumstances since it is admitted that it was neither the manufacturer nor a seller of the saw which injured plaintiff. It merely acquired the assets and certain liabilities of the Powermatic Division of DeVlieg-Bullard.

The Court of Appeals for this circuit has explained that "where one company sells or transfers all of its assets to another, the second entity does not become liable for the debts and liabilities, including torts, of the transferor." Polius v. Clark Equip. Co., 802 F.2d 75, 77 (3d Cir. 1986). An exception to this general rule exists where: "(1) [the purchaser] assumes liability; (2) the transaction amounts to a consolidation or merger; (3) the transaction is fraudulent and intended to provide an escape from liability; or (4) the purchasing corporation is a mere continuation of the selling company." Id. at 78. In rejecting two theories expanding the exceptions to successor non-liability, our Court of Appeals noted, "[w]e perceive no principled distinction between victims of corporate negligence and those whose recovery rests on § 402A that would justify departure from the traditional rule of corporate successor liability in strict liability cases." Id. at 80. Thus, JET's acquisition of the Powermatic Division assets must fall into one

of the four above-mentioned exceptions for it to be liable under Counts I and II.[6]

It is clear, however, that none of the four exceptions to successor non-liability applies here. First, JET did not assume liability under a strict liability or negligence theory as set forth in Counts I and II. Our predecessor in this case, Judge Finch, correctly concluded that JET did not purchase the Powermatic Division assets "free and clear" but instead expressly accepted certain liabilities. The liabilities JET accepted, however, do not encompass the tort claims advanced by plaintiff in his amended complaint.

The Bankruptcy Court's Order authorizing the sale of the Powermatic Division assets stated that JET would not be "deemed to be a successor of [DeVlieg-Bullard]" and that it would "not be responsible for any of [DeVlieg-Bullard's] liabilities or obligations, other than those expressly assumed by [JET] pursuant to the Asset Purchase Agreement ...." Def.'s Statement of Undisputed Facts, Ex. I at ¶ J. The Asset Purchase Agreement is explicit that JET assumed tort liability only for products sold

---

6. We note that JET was not technically the "purchaser" of the Powermatic Division assets. Instead, JET formed Powermatic Corporation ten days before the Closing Date and transferred its rights under the Asset Purchase Agreement to Powermatic Corporation. JET merged with Powermatic Corporation almost two years later. Neither party expounds on the exact nature of the relationship between JET and Powermatic Corporation before the companies merged. JET, however, refers to itself as the purchaser of the Powermatic Division assets and does not challenge its liability vis a vis Powermatic Corporation. Thus, we will refer to JET as the purchaser.

<u>after</u> the closing date, that is, October 15, 1999. There is no dispute that the saw at issue was manufactured and sold many years before that date.

Second, JET's acquisition did not amount to a consolidation or a merger. A transaction deemed an "asset purchase agreement" may be a de facto merger where:

> (1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations.
>
> (2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.
>
> (3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.
>
> (4) The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business of operations of the seller corporation.

<u>Berg Chilling Sys. v. Hull Corp.</u>, 435 F.3d 455, 468-69 (3d Cir. 2006).

Plaintiff maintains that JET's acquisition of the Powermatic Division assets was a de facto merger because "Powermatic was not in bankruptcy and that after the bankruptcy sale ... Powermatic continued to operate as an independent entity known as Powermatic Corporation, until it 'merged' with Jet Tools

-10-

to become WMH Tool Group. Thereafter, the Powermatic Corporation and DeVlieg-Bullard, ceased to exist as soon as legally permissible." Pl.'s Opp'n at 9. This misunderstands the de facto merger inquiry and conflates JET's purchase of the Powermatic Division assets with JET's ultimate renaming to WMH Tool Group.[7]

It is true that "Powermatic" was not in bankruptcy — it was DeVlieg-Bullard that was in bankruptcy. As the corporation that sold the Powermatic Division assets, it is DeVlieg-Bullard's relationship with JET after the asset purchase agreement that is key to the de facto merger analysis. That is, for there to be the de facto merger here, we must determine whether DeVlieg-Bullard in fact merged into JET through the sale of the Powermatic Division Assets. The record does not evince a de facto merger in this case. JET retained some individuals who previously worked for the Powermatic Division of DeVlieg-Bullard, Inc. as employees when it purchased the Powermatic Division assets. However, JET purchased the Powermatic Division assets from DeVlieg-Bullard for cash, DeVlieg-Bullard continued to exist after the transaction, and JET assumed only the most limited liabilities and obligations of DeVlieg-Bullard, Inc. The

---

7. The exact nature of the transaction between JET and Wilton Corporation that lead to JET being renamed WMH Tool Group is not contained in the record before us. That transaction is, however, inconsequential since it is JET's purchase of the Powermatic Division assets that is pivotal.

transaction in issue is therefore clearly a true asset purchase and not a de facto merger.

Nor is there any evidence in the record that JET should be held liable under the third exception to successor non-liability, that is, that the transaction is fraudulent and intended to provide an escape from liability. The Bankruptcy Court Order authorizing the sale of the Powermatic Division assets states:

> Prior to filing its bankruptcy petition, [DeVlieg-Bullard] engaged in an extensive effort to sell the Powermatic Assets. The decision to sell was based on determinations by [DeVlieg-Bullard] that the Powermatic Division was not part of [DeVlieg-Bullard's] "core business" and that [DeVlieg-Bullard's] need to raise cash to ease its cash flow and debt service burdens made the Powermatic Division a divestiture candidate.

Def.'s Statement of Undisputed Facts, Ex. I at 3.

The Bankruptcy Court Order makes clear that the sale of the Powermatic Division assets was done to raise needed capital for DeVlieg-Bullard. It was not undertaken to escape litigation against DeVlieg-Bullard as a consequence of its ownership of the Powermatic Division assets.

Finally, JET was not a mere continuation of DeVlieg-Bullard. The continuation exception is applicable "when the form of the transfer does not accurately portray substance ..." and "the new organization is simply the older one in another guise." Polius, 802 F.2d at 78. The asset transfer was just that, a transfer of some of DeVlieg-Bullard's assets to JET in order to

raise capital. DeVlieg-Bullard continued to operate, separate and apart from JET, after the sale of the Powermatic Division assets, and thus JET was not a mere continuation of DeVlieg-Bullard.

JET's purchase of the Powermatic Division assets therefore does not fall into any of the four exceptions to successor non-liability. Accordingly, the terms of the Asset Purchase Agreement control, and JET is not liable under the Restatement 2d Torts § 402A or a negligence theory of products liability for any products sold before October 15, 1999, including the saw at issue here. We will grant JET's motion for summary judgment on Counts I and II of plaintiff's amended complaint.

IV.

We next must consider plaintiff's claim for breach of warranty. Count III of plaintiff's amended complaint alleges that:

> The Defendants, Powermatic, Inc. and [JET], warranted that the machine was of good quality and ready for use at Armory [sic] Industries, Inc., that it was fit for use in the carpentry business; that the various components of the product were manufactured of good merchantable parts; that it was properly designed, retooled, refurbished, assembled, inspected and tested.

Am. Compl. at 4.

Plaintiff does not allege that any express warranties were breached. Instead it appears that the complaint alleges

-13-

that Powermatic, Inc. and JET violated the implied warranty of merchantability. See 11A V.I.C. § 314.

As with plaintiff's tort claims, his claim for breach of the implied warranty of merchantability is subject to the general rule of successor non-liability. This claim, however, falls within the first exception to the general rule — JET assumed liability for all warranty claims. See Polius, 802 F.2d at 77. The Asset Purchase Agreement states:

> Subject to the conditions specified in this Agreement, Buyer agrees to assume at the Closing and discharge when due and payable the following liabilities of Seller related to the Business ...
> (c) Warranty Claims. All liabilities for warranty claims with respect to products of the Business, regardless of whether such claim occurred before, on or after the Closing Date ...

Def.'s Statement of Undisputed Facts, Ex. J at § 1.4.[8]

The elements of a claim for breach of the implied warranty of merchantability and a claim based upon the Restatement 2d Torts § 402A are essentially the same. See Gumbs v. Int'l Harvester, Inc., 718 F.2d 88, 94-95 (3d Cir. 1983). The Virgin Islands code provides:

> (1) Unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind ....
> (2) Goods to be merchantable must be at least such as ...

---

8. Defendant does not contest that Powermatic Model 68 12" Tilting Arbor Saws are "products of the Business."

>           (c) are fit for the ordinary purposes for
>       which such goods are used ...

11A V.I.C. § 314.[9]

Parties to a contract may, however, exclude or modify implied warranties. The Virgin Island's Code provides:

> (2) Subject to subsection (3), to exclude or modify the implied warranty or [sic] merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."
> (3) Notwithstanding subsection (2)
>     (a) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is", "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty ...

11A V.I.C. § 316.

As we have mentioned previously, JET does not concede that the saw on which plaintiff was injured is a Powermatic Model 68 12" Tilting Arbor Saw. Considering the facts most favorable to plaintiff, we will assume that the saw in question is a Powermatic Model 68 12" Tilting Arbor Saw and that any warranty claim liability with respect to it became the responsibility of JET pursuant to the Asset Purchase Agreement approved by the Bankruptcy Court Order. Even so, plaintiff's claim for breach of

---

9. The Virgin Island's Code codifies the Uniform Commercial Code. See Gumbs, 718 F.2d at 94 n.8.

warranty against JET fails. The Operating Instructions and Parts List for the Powermatic Model 68 12" Tilting Arbor Saw contained an express warranty period which has long since expired and is not an issue here. The warranty provision further states: "THIS WARRANTY IS MADE EXPRESSLY IN PLACE OF ALL OTHER WARRANTIES OR GUARANTEES, EXPRESS OR IMPLIED, WITH RESPECT TO FITNESS, MERCHANTABILITY, QUALITY OR OPERATIVENESS." Def.'s Statement of Undisputed Facts, Ex. L at 2. This language, which appears on the second page of the Operating Instructions and Parts List, in a text box, is conspicuous. Therefore, under the terms of the saw's warranty, plaintiff cannot state a claim for breach of the implied warranty of merchantability, and we will grant summary judgment in favor of JET on Count III as well.

              BY THE COURT:


              /s/ Harvey Bartle III
              HARVEY BARTLE III   C.J.
              SITTING BY DESIGNATION